UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PAYSAFE PAYMENT PROCESSING | § | |
| SOLUTIONS, LLC AND | § | |
| IPAYMENT, INC. | § | |
|     PLAINTIFFS, | § | |
| | § | |
| v. | § | CIVIL ACTION NO._____ |
| | § | |
| GROUNDHOG ENTERPRISES, INC. | § | |
| D/B/A MERCHANT LYNX SERVICES | § | |
|     DEFENDANT. | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

    Paysafe Payment Processing Solutions, LLC ("Paysafe") and iPayment, Inc. ("iPayment" and, together with Paysafe, the "Plaintiffs") file this Original Complaint against Groundhog Enterprises, Inc. d/b/a Merchant Lynx Services ("Merchant Lynx") and respectfully show:

## I.    STATEMENT OF THE CASE

    1.    Plaintiffs and Merchant Lynx had a 16-year relationship, during which time Merchant Lynx had access to Plaintiffs' confidential information and trade secrets.  Pursuant to the terms of an asset purchase and sale transaction in March 2019 between the parties, for which Paysafe paid Merchant Lynx $15 million, Merchant Lynx was required to maintain the confidentiality of Plaintiffs' confidential information and was prohibited from soliciting or interfering with valuable and long-standing merchant relationships.  Instead of honoring its commitments, Merchant Lynx engaged in a campaign to take the most valuable of Plaintiffs' merchant accounts for itself, using Plaintiffs' sensitive confidential information to do so.

    2.    When confronted with evidence of this wrongful conduct in November 2019, Merchant Lynx promptly indicated its willingness to "do anything" to remedy the harm caused to

Plaintiffs, including agreeing to engage a neutral third party to review Merchant Lynx's post-transaction residual reports so as to determine the extent to which Merchant Lynx and its sales agents have wrongfully re-solicited the merchant accounts acquired by Paysafe.  In a good faith effort to resolve this matter without the need of resorting to litigation, Paysafe – not Merchant Lynx – spent several weeks, first identifying a suitable payments industry expert, and then obtaining the third party expert's agreement to accept the engagement.  However, after weeks of stringing Plaintiffs along in an effort to dissuade them from taking immediate legal action, Merchant Lynx refused to take any meaningful action to address its misconduct or to sign an engagement agreement with a mutually-agreed third party expert who would have reviewed the transactions.  Merchant Lynx has also failed to respond to any other of Plaintiffs' reasonable requests for information relating to these actions.

3.      Paysafe and iPayment are subsidiaries of Paysafe Group, Ltd. ("Paysafe Group"), and service thousands of "brick and mortar," mobile, and online businesses in securely accepting and processing credit and debit card payments.  Plaintiffs are registered with the Visa and MasterCard network through its association with various national banks and financial institutions, which authorizes Plaintiffs to market and provide their payment processing services to merchants. Paysafe Group is one of the five largest payment processors in North America, processing over $100 billion in credit and debit card charges each year.

4.      Merchant Lynx is an independent sales organization (ISO) that – through its employees and agents – markets the payment processing services of various third parties to merchants.  Through a series of agreements between 2003 and 2019, Merchant Lynx agreed to provide such services to both Paysafe and iPayment.  Under these agreements, Merchant Lynx agreed to solicit and board merchants with iPayment and Paysafe for payment processing services.

In exchange, Merchant Lynx had the right to receive periodic payments – known as residuals – based on revenues generated from the merchants that it boarded with Plaintiffs.

5.      In March 2019, Merchant Lynx and Paysafe signed an Agreement for the Sale of Residuals (the "RBO Agreement").  Under the RBO Agreement, Paysafe purchased all of the residuals then being generated by all active merchant accounts previously boarded with iPayment by Merchant Lynx.  In exchange for purchasing the right to these residual payments, Paysafe paid Merchant Lynx a lump sum of $15 million, with a contingent right for Merchant Lynx to earn up to $3 million in additional earn-out payments.  However, the RBO Agreement was expressly conditioned on Merchant Lynx's covenant and agreement that, for a period of at least three (3) years, neither Merchant Lynx nor any of its affiliates would, directly or indirectly, solicit any of the merchant accounts purchased by Paysafe for the purposes of providing credit card authorization, processing, or related services.  The RBO Agreement further required that Merchant Lynx preserve the confidentiality of any proprietary information regarding such purchased merchant accounts.  Moreover, the RBO Agreement also required Merchant Lynx to obtain written non-solicitation agreements from the agents used by Merchant Lynx to interact with Paysafe's customers and to provide copies of those executed agreements to Paysafe within five (5) days of execution, but when Paysafe requested the agreements, Merchant Lynx failed to provide all of them.  Notably missing were the non-solicitation agreements for several of the agents known to have already taken Paysafe's customers.  And even for agreements Merchant Lynx did provide, none of them – as evidenced by the dates on the agreements – were timely procured.  Finally, under the RBO Agreement, Merchant Lynx agreed to indemnify Paysafe from any losses related to the breach of these covenants and/or any other representations and warranties made by Merchant Lynx in the RBO Agreement.

6.     Since receiving the lump sum purchase price on April 1, 2019, Merchant Lynx has repeatedly violated the RBO Agreement and its other prior agreements with Plaintiffs.  As discussed below, during the six-month period immediately following the execution of the RBO Agreement, residuals from the purchased merchant accounts have dropped by approximately 62%, with the most valuable merchant accounts being moved – by Merchant Lynx agents – to other payment processors in clear violation of Merchant Lynx's covenants.  Additionally, Merchant Lynx sales agents have fraudulently posed as Paysafe agents in order to wrongfully move merchants from Paysafe to new payment processors, without these merchants' knowledge.  This type of fraudulent activity is referred to in the payments industry as "slamming."  Merchant Lynx is liable to Plaintiffs for millions of dollars in damages caused by its wrongful conduct.

7.     Additionally, this Court should enter a permanent injunction pursuant to Federal Rule of Civil Procedure 65 because:

(A) Plaintiffs have a probable right to prevail on the merits of its breach of contract claim and all or part of the relief at issue requires the restraint of acts prejudicial to Plaintiffs;

(B) Plaintiffs have no adequate remedy at law;

(C) Granting injunctive relief imposes minimal hardship on Merchant Lynx and simply restores the *status quo* that has existed at the time of the RBO Agreement;

(D) Plaintiffs and their merchants face a real and imminent risk of irreparable injury or loss if Merchant Lynx continues its fraudulent conduct, wrongful solicitation, slamming activities, and improper use of Plaintiffs' trade secrets and confidential information; and

(E) The public interest would be served if an injunction is granted.

## II.     PARTIES

8.     Paysafe Payment Processing Solutions, LLC is a Delaware limited liability company.  The sole member of Paysafe Payment Processing Solutions, LLC is Paysafe Holdings

(US) Corp., a Delaware corporation that maintains its principal place of business in Texas. Accordingly, Paysafe is a citizen of Delaware and Texas for the purpose of 28 U.S.C. § 1332.[1]

9.    iPayment Inc. is a Delaware corporation that maintains its principal place of business in California.  28 U.S.C. § 1332(c)(1).

10.    Groundhog Enterprises, Inc. d/b/a Merchant Lynx Services is a Georgia corporation that maintains its principal place of business in Florida.  Merchant Lynx may be served with process through its registered agent, Mr. Tim Jebavy, 6230 Shiloh Road, Suite 220, Alpharetta, Georgia 30005, or wherever else Mr. Jebavy may be found.  Alternatively, pursuant to Federal Rule of Civil Procedure 4(h), Merchant Lynx may be served with process through its Chief Executive Officer, Mr. John Kucyk, 3056 SE Dune Drive, Stuart, Florida 34996 or 348 Hiatt Drive, 2nd Floor, Palm Beach Gardens, Florida 33418 or 175 Admiral Cochrane Drive, Suite 404, Annapolis, Maryland 21401, or wherever else Mr. Kucyk may be found.

### III.    JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.  Paysafe and iPayment are completely diverse from Merchant Lynx, and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

12.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the claims giving rise to this suit occurred in this District.

13.    Merchant Lynx is subject to personal jurisdiction in this District.  Merchant Lynx conducts business in Texas, and this dispute arises out of a contract negotiated in Texas, performable in Texas, and concerning one or more merchants located in Houston, Texas.

---

[1] A limited liability company's citizenship for diversity of citizenship purposes is determined by the membership of its members.  *Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077 (2008).

14.     Additionally, jurisdiction and venue are proper in this District because the parties expressly agreed to this forum.  Specifically, in the RBO Agreement, the parties agreed that "each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the federal courts located in Harris County, Texas for the purpose of any suit, action or other proceeding arising out of or relating to this Agreement and each of the Parties hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in any such court and irrevocably waives any objection it may now or hereafter have as to the venue of any such suit, action or proceeding brought in any such court or that such court is an inconvenient forum. Each Party hereby irrevocably waives all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to this Agreement."  RBO Agreement § 6.2.

## IV.     FACTUAL BACKGROUND

15.     As described above, Paysafe and its affiliate, iPayment, enable tens of thousands of businesses throughout the United States and Canada to securely accept credit and debit card payments.  Plaintiffs are registered with the Visa and MasterCard network through its association with various national banks and financial institutions, which authorizes Plaintiffs to market and provide its payment processing services to merchants.

16.     This action arises out of a series of transactions between iPayment and Paysafe, on the one hand, and Merchant Lynx, on the other hand.

17.     Merchant Lynx is an independent sales organization (ISO) that – through its employees and agents – markets the payment processing services of various third parties to merchants.

18.     Through a series of agreements between 2003 and 2019, Merchant Lynx agreed to provide such marketing services to iPayment and Paysafe.  Specifically, in December 2003,

iPayment and Merchant Lynx executed an ISO/MSP Merchant Solicitation Agreement (the "iPayment Solicitation Agreement").[2]  In July 2013, iPayment and Merchant Lynx executed a Sub-ISO Agreement (the "iPayment Sub-ISO Agreement" and together with the Solicitation Agreement, the "iPayment Agreements").[3]  In January 2019, Paysafe and Merchant Lynx executed a Registered ISO Agreement (the "Paysafe ISO Agreement").[4]  Finally, in March 2019, Paysafe and Merchant Lynx executed an Agreement for the Sale of Residuals, which is referenced above as the RBO Agreement.[5]

19.     Under the iPayment Agreements, Merchant Lynx solicited and boarded merchants with iPayment for payment processing services.  In exchange, Merchant Lynx was entitled to receive periodic payments – residuals – based on revenues generated from the merchants that it boarded with iPayment.  These residuals were an income stream for Merchant Lynx based on the boarded merchants' payment processing transactions through iPayment.

20.     In exchange for this revenue, Merchant Lynx agreed in the iPayment Sub-ISO Agreement that in the event of any termination of the agreement, Merchant Lynx and its Affiliates would not directly or indirectly solicit, persuade, or influence any merchant for payment processing services provided by another company or in any other way interfere with the contractual relationship between iPayment and such merchant.  *See* Exhibit B at § 12(a) ("Non-Solicitation"). Further, Merchant Lynx acknowledged that it would receive confidential information from Paysafe and Paysafe's customers related to their financial and business operations, and Merchant Lynx agreed to maintain the confidentiality of such information during the term of the Sub-ISO

---

[2] A true and correct copy of the Solicitation Agreement is attached as Exhibit A to this Complaint.
[3] A true and correct copy of the Sub-ISO Agreement is attached as Exhibit B to this Complaint.
[4] A true and correct copy of the New ISO Agreement is attached as Exhibit C to this Complaint.
[5] A true and correct copy of the RBO Agreement is attached as Exhibit D to this Complaint.

Agreement and for five years after its termination and not use or disclose that information during that period.  *Id.* at § 13 ("Confidentiality").  After the execution of the Sub-ISO Agreement, Paysafe provided confidential financial and business operations information to Merchant Lynx. Finally, Merchant Lynx and iPayment agreed that, if Merchant Lynx breached or threatened to breach the non-solicitation or confidential information provisions of the Sub-ISO Agreement, iPayment had the express right to have those provisions specifically enforced or have Merchant Lynx's actions enjoined without bond because Merchant Lynx's breach "would cause irreparable harm" and "money damages would not provide an adequate remedy."  *Id.* at § 14 ("Equitable Relief").

21.     In June 2018, Paysafe Holdings (U.S.) Corp. acquired iPayment, and iPayment and Paysafe were thereafter commonly owned affiliates.

22.     In July 2018, the iPayment Sub-ISO Agreement between Merchant Lynx and iPayment was terminated.  The termination of the iPayment Sub-ISO Agreement did not terminate Merchant Lynx's right to receive residuals from previously boarded merchants, but it did trigger Merchant Lynx's non-solicitation obligations under the iPayment Sub-ISO Agreement § 12(a). Prior to the termination of the Sub-ISO Agreement, Merchant Lynx had executed a new merchant solicitation agreement with TSYS Acquiring Services, LLC, a third party payment processor. Thus, for the time being, save for the ongoing residual and non-solicitation obligations described above, the business relationship between Merchant Lynx and Plaintiffs had ended.

23.     In late 2018, Merchant Lynx advised Plaintiffs that it was interested in monetizing the residual income stream it was receiving under the iPayment Agreements.  Subsequently, Merchant Lynx and Plaintiffs agreed in principle to the terms of a residual buy out transaction, or an "RBO."

24.     Under an RBO transaction, the purchaser buys the seller's monthly residual income stream for a multiple of the monthly residual amount.  The amount of that multiple is generally the most highly negotiated element of any RBO transaction.  While how high a multiple any purchaser will ultimately agree to pay may be dependent on several factors, the most important factor in determining the residual buy-out multiple is the merchant portfolio's attrition rate.  In this context, the attrition rate means how slowly or quickly the monthly residual amount is anticipated to decline over time.  Generally speaking, attrition occurs for one of two reasons:  (i) merchants go out of business, or (ii) merchants cancel their merchant processing agreements and move to another credit card processor.  In either case, those merchants cease generating revenues for the purchaser and the monthly residual amount thus declines.

25.     Based on its lengthy and extensive knowledge of this merchant portfolio, Paysafe knew that Merchant Lynx's merchant portfolio was highly stable because it had an historical month-over-month attrition rate between January 2016 and November 2018 of approximately 1.9% per month.  Based on this low attrition rate, Paysafe agreed to purchase Merchant Lynx's entire residual income stream derived from the iPayment Agreements – approximately $500,000 per month – for a lump sum purchase price of $15 million, or a multiple of thirty (30) times the monthly residual amount.  In addition, Merchant Lynx had the ability to earn an additional $3 million in contingent earn out payments based on new merchant production under the New ISO Agreement described in paragraph 26 below.

26.     In January 2019, in anticipation of the forthcoming residual buy-out transaction, and as a condition to Paysafe's willingness to consummate the RBO transaction, Paysafe and Merchant Lynx executed the New ISO Agreement.  Similar to the iPayment Agreements, under the New ISO Agreement, Paysafe engaged Merchant Lynx to solicit prospective merchants to

apply to Paysafe for card processing and related services in exchange for the payment of monthly residuals.  The New ISO Agreement also provides that Merchant Lynx will make cardholder and merchant data available to Paysafe, grants Paysafe certain inspection and audit rights, and requires Merchant Lynx's compliance with data security obligations.  *See* Exhibit C at § 6(j)(ii).

27.     In late March 2019, Merchant Lynx and Paysafe signed the RBO Agreement, and the RBO transaction closed on April 1, 2019.  *See* Exhibit D.  Under the RBO Agreement, Paysafe purchased all of the residuals then being generated by all active merchant accounts previously boarded by Merchant Lynx under the iPayment Agreements.  As of the April 1, 2019 closing date, the 3,187 purchased merchant accounts were generating residuals of approximately $500,000 per month.  In exchange for purchasing this $500,000 monthly residual income stream, Paysafe paid Merchant Lynx a lump sum purchase price of $15 million, together with a right for Merchant Lynx to earn up to $3 million in additional contingent payments based on future new merchant production under the New ISO Agreement.

28.     However, Paysafe's agreement to consummate the RBO transaction was expressly conditioned on Merchant Lynx's covenants set forth in the RBO Agreement, including but not limited to: (i) neither Merchant Lynx nor any of its affiliates would, directly or indirectly, solicit any of the purchased merchant accounts for the purposes of providing credit card authorization, processing, or related services for at least three (3) years,[6] expressly including a requirement for

---

[6] *See* Exhibit D at § 3.1:

    3.1    Non-Solicitation.

(a)    With respect to any iPayment Merchant Account, including but not limited to each of the iPayment Merchant Accounts set forth on Schedule 1 hereto, commencing on the Transfer Date and ending on later to occur of (x) the third (3rd) anniversary of such date or (y) the date that Seller's [Merchant Lynx's] non-interference obligation ends pursuant to the terms of the Solicitation Agreements [the ISO/MSP Agreement and the Sub-ISO Agreement] or the New ISO Agreement, neither Seller nor any of its Affiliates shall, directly or indirectly, (i) solicit such iPayment Merchant Account for purposes of providing credit card authorization, processing and/or related services to such iPayment Merchant Account or assisting any Person other than Buyer or its Affiliates to provide any such services to such iPayment Merchant Account, or in any manner persuade or

Merchant Lynx to secure a written non-solicitation from each sales agent and to produce each written agreement to Plaintiffs;[7] and (ii) Merchant Lynx and its affiliates would preserve the confidentiality of any information related to the purchased merchant accounts.[8]

---

influence such iPayment Merchant Account to cease or diminish any business relationship with Buyer or any of its Affiliates; (ii) solicit or attempt in any manner to persuade or influence any employees of Buyer or any of its Affiliates to work for any other Person; or (iii) disrupt or attempt to disrupt any current business relationship, contractual or otherwise, between Buyer or its Affiliates, on the one hand, and any sponsor bank, processor, merchant acquirer, customer, merchant or agent of Buyer or its Affiliates, on the other hand.

(b)      Seller further agrees that it will not provide the names or other identification of any iPayment Merchant Accounts to any third parties. Seller shall (i) instruct all of Seller Agents regarding the non-solicitation requirements set forth in this Section 3.1; (ii) enter into a written agreement, substantially in the form of Exhibit "A" hereto, with each such Seller Agent, an executed copy of which shall be delivered to Buyer within five (5) days of its execution by such Seller Agent; and (iii) upon written request of Buyer, assign to Buyer all of Seller's rights to pursue such Seller Agents for any such violation.

[7] *See* Exhibit D at § 3.1(b).

[8] *See* Exhibit D at § 3.2:

3.2      Confidential Information.   Each of the Parties acknowledges and agrees that in the performance of its duties under this Agreement, either Party may communicate to the other (or its designees) certain confidential and proprietary information, including without limitation information concerning the know-how, technology, techniques, or business or marketing plans related thereto (collectively, "Confidential Information"), all of which are confidential and proprietary to, and trade secrets of the disclosing Party. The receiving Party shall not copy, reproduce, divulge, publish, circulate or disclose Confidential Information to any Person without the prior written consent of the disclosing Party, except to the receiving Party's employees and representatives (including its attorneys, accountants and financial advisors) who have a need to know of such information in connection with the transactions contemplated by this Agreement and who have expressly agreed to comply with the restrictions set forth in this Section 3.2. The receiving Party shall exercise at least the same degree of care in safeguarding and protecting the Confidential Information from disclosure that it would use to protect its own proprietary information, and shall not use any Confidential Information in any manner whatsoever except as expressly permitted by this Agreement or any other written agreement with the disclosing Party. In the event that receiving Party reasonably believes after consultation with counsel that it is required by law or order or directive of a governmental or regulatory authority (including pursuant to interrogatories and discovery requests) to disclose any Confidential Information, the receiving Party will (a) promptly provide the disclosing Party with notice before such disclosure (if not prohibited by law) so that the disclosing Party may attempt, at its expense, to obtain a protective order or other assurance that Confidential Information will be accorded such confidential treatment and (b) reasonably cooperate with the disclosing Party, at the disclosing Party's expense, in attempting to obtain such order or assurance. The provisions of this Section 3.2 shall not apply to any information, documents or materials which are disclosed in connection with any proceeding to enforce the terms and conditions of this Agreement or, as shown by appropriate written evidence, (i) is already known to receiving Party free of any restriction at the time it is obtained; (ii) becomes publicly available through no wrongful act of receiving Party or its Affiliates; or (iii) is independently developed by receiving Party without reference to any Confidential Information.

---

29.     Merchant Lynx and Paysafe agreed that if Merchant Lynx or its affiliates breached or threatened to breach RBO Agreement § 3.1 – Non-Solicitation – or § 3.2 – Confidentiality – Paysafe has the right to equitable relief, including specific enforcement of those provisions, without a bond because any breach "cause[s] irreparable harm" to Paysafe and "money damages would not provide an adequate remedy." *Id.* at § 3.3 ("Equitable Relief").

30.     Finally, under the terms of the RBO Agreement, Merchant Lynx agreed to indemnify Paysafe from any losses related to the breach of these covenants and the breach of any other representations and warranties made by Merchant Lynx in the RBO Agreement.[9]

31.     Since the closing of the residual buy-out transaction on April 1, 2019, Merchant Lynx and its sales agents have repeatedly breached Merchant Lynx's non-solicitation and confidentiality obligations to Paysafe under the RBO Agreement, as well as to iPayment under the iPayment Agreements.  In six short months, the residuals generated by the purchased merchant accounts have declined from approximately $500,000 per month at closing, to approximately $190,000 per month in September 2019.  In other words, a merchant portfolio that had, between January 2016 and November 2018, experienced an average month-over-month attrition rate of just 1.9%, has, since April 1, 2019, experienced an average month-over-month attrition rate of approximately 11.4%.

---

[9] *See* Exhibit D § 4.1:

> 4.1     Indemnification by Seller.  Seller hereby agrees to defend, indemnify and hold harmless Buyer and its Affiliates, and each of their respective employees, members, stockholders, directors, managers, officers or agents (collectively, "Buyer Indemnitees"), from and against any loss, liability, damage, penalty or expense (including reasonable attorney's fees, expert witness fees and costs of defense) any such Buyer Indemnitee suffers or incurs from and after the Effective Date as a result of (a) any failure by Seller or any of its Affiliates to comply with the terms of this Agreement; (b) any inaccurate representation or warranty made by Seller or any of its Affiliates in this Agreement; (c) any solicitation of, or interference with, any iPayment Merchant Account by any Seller Agent; or (d) any act of fraud or willful misconduct committed by Seller or any of its Affiliates; and (e) any and all claims, actions, suits, proceedings, investigations, demands, assessments and judgments related or incident to any of the foregoing.

32.     This extraordinary spike in attrition is not random; rather, it is clear that Merchant Lynx sales agents are targeting, or "cherry picking", the most valuable merchant accounts in the portfolio, and moving them to other payment processors.  In fact, of the 3,187 purchased merchant accounts originally in the acquired portfolio, only a little more than 300 merchants have ceased processing with Paysafe – or less than ten percent (10%) of the portfolio.  Yet, this 10% decline in merchant count has resulted in a 62% decline in monthly residuals.  Clearly, this attrition is not random.  To the contrary, the most productive and therefore valuable merchants are being specifically targeted and solicited by Merchant Lynx, all in violation of Merchant Lynx's non-solicitation and confidentiality obligations to Plaintiffs.

33.     Merchant Lynx and its sales agents are uniquely knowledgeable about these merchant accounts because they initially solicited and boarded these merchants with iPayment under the iPayment Agreements.  Critically, however, this merchant information, including information regarding the merchants' monthly processing volumes, revenues, and profitability, is confidential information owned exclusively by Plaintiffs.  Merchant Lynx's use of that confidential information to target, solicit and influence the most highly profitable merchants to move away from Paysafe is therefore a blatant breach of both the non-solicitation and confidentiality covenants set forth in the RBO Agreement and in the iPayment Agreements.

34.     Further evidence that the spike in attrition is the direct result of Merchant Lynx's wrongful actions is the fact that, of the 315 merchants who had ceased processing with Paysafe as of September 30, 2019, roughly 160 of those merchants never bothered to close their Paysafe accounts.  Because this results in those merchants continuing to pay minimum monthly fees to Paysafe for processing services they are no longer using, this is strong evidence that these merchants are being moved without their knowledge.

35.     This is consistent with the facts that Plaintiffs have uncovered to date showing that Merchant Lynx's sales agents have engaged in intentionally wrongful conduct known as "slamming."  Slamming involves a sales agent – in this case, a Merchant Lynx agent – fraudulently posing as a Paysafe agent in order to wrongfully move a purchased merchant account to a new provider without that merchant's knowledge.  These efforts are not only wrongful and fraudulent, but also clumsy because it often results in Merchant Lynx moving a merchant to a new payment processor without the merchant ever terminating its existing processing agreement with Paysafe. This activity is thus harmful to both the merchant and to Paysafe.

36.     Several former merchant customers have provided Paysafe with direct evidence of slamming by at least one Merchant Lynx sales agent.  Specifically, three restaurant merchants previously solicited and boarded by Merchant Lynx sales agent Mike Zavala with iPayment under the iPayment Agreements were among the purchased merchant accounts included in the RBO transaction of April 1, 2019.  Not long after, Mike Zavala returned to wrongfully re-solicit these restaurant merchants.

- In one restaurant, Mr. Zavala falsely told the merchant that it needed new credit card processing equipment.  When Mr. Zavala changed the merchant's equipment, unbeknownst to the merchant, Mr. Zavala simultaneously moved the merchant to a new payment processor as well.  As a result, Paysafe's processing volume for that restaurant stopped in mid-May 2019 and there has been no processing revenue from that merchant thereafter.

- In another restaurant, Mr. Zavala falsely told the daughter of the proprietor that the credit card processing company they used (Paysafe) was "merging," so he needed

to open a new account.  As a result, Paysafe's processing volume for that restaurant stopped at the end of May 2019.

- In yet a third restaurant, the merchant advised Paysafe that "Michael with Merchant Lynx switched me" in or around July or August 2019. As a result, Paysafe's processing volume for that restaurant stopped in August 2019.

These three merchants advised Paysafe of Mr. Zavala's actions, which directly violate the terms of the RBO Agreement and the iPayment Agreements.

37.     A fourth restaurant has advised Paysafe that he "was switched by his Merchant Lynx agent" in or around April or May 2019.  Paysafe has been unable to ascertain which specific Merchant Lynx agent committed this act, but in any case, as a result, Paysafe's processing volume for that restaurant stopped in May 2019.

38.     On information and belief, using Paysafe's customer data that it was obligated to keep confidential and not used to solicit business, Merchant Lynx sales agents continue to solicit Paysafe's customers either for Merchant Lynx's direct benefit or for the benefit of Merchant Lynx's agents through their agreements with other individual sales organizations or payment processors.  On information and belief, the Merchant Lynx sales agents who have boarded Plaintiffs' customers with other financial institutions did so because Merchant Lynx defaulted on its obligations to ensure that Plaintiffs' information was safe from misuse and because Merchant Lynx failed – despite its express obligation in the RBO Agreement – to ensure that its employees and agents executed binding non-solicitation agreements.[10]

---

[10] *See* Exhibit D at § 3.1(b).

39.     Plaintiffs contacted Merchant Lynx regarding Merchant Lynx's wrongful conduct and demanded restitution.[11]  Merchant Lynx has refused to remedy the harm it has caused to Plaintiffs.  In addition, Merchant Lynx refused to produce all of the non-solicitation agreements that it was obligated under the RBO to secure from its sales agents.  Most notably, the missing non-solicitation agreements are from agents who have taken Paysafe's customers in violation of Merchant Lynx's obligations under the RBO.  And for the non-solicitation agreements that were provided to Paysafe, they were executed well beyond the five day deadline in the RBO, meaning dozens of Merchant Lynx's agents were under no obligation to refrain from soliciting Paysafe's customers for Merchant Lynx or any other company.  This failure is a result of Merchant Lynx never seeking or securing executed agreements as it was required to do and appears to be part of its on-going effort to hide its misconduct and the misconduct of its employees and agents.

40.     Whatever its motivation, Merchant Lynx took Plaintiffs' payment, caused serious harm to the Plaintiffs, and has breached and forsaken its responsibilities to control its conduct and the conduct of its sales agents to Plaintiffs' detriment.  Therefore, Merchant Lynx has materially defaulted on its obligations, including its indemnity obligations, and should be held accountable as follows:

## V.     CAUSES OF ACTION

**Count 1:        Breach of the iPayment Sub-ISO Agreement and RBO Agreement**

41.     Under the iPayment Sub-ISO Agreement, Merchant Lynx agreed not to directly or indirectly solicit, persuade, or influence any merchant to use payment processing services provided by another company or in any other way interfere with the contractual relationship between iPayment and such merchant.  *See* Exhibit B at § 12(a).

---

[11] *See* Exhibit D § 4.1; *see also* Exhibit E.

42.     Under the RBO Agreement, Merchant Lynx agreed not to directly or indirectly solicit, persuade or influence any purchased merchant account to use  payment processing services provided by another company or in any other way interfere with the contractual relationship between Paysafe and such merchant.  *See* Exhibit D at § 3.1.  Merchant Lynx further agreed to instruct all of its sales agents of Merchant Lynx's non-solicitation obligations and to secure its sales agents' written acknowledgment of those obligations and to provide them to Paysafe within five (5) days of execution.  *Id.*  Further, Merchant Lynx agreed to maintain the confidentiality of all merchant information, which includes but is not limited to information related to who the merchants are and their processing volumes, revenues, and profitability.  *See* Exhibit D at § 3.2.

43.     As detailed above and as discovery will demonstrate, Merchant Lynx has violated its contractual obligations to Paysafe and iPayment.  Rather than honoring its covenants and representations, Merchant Lynx and its sales agents have engaged in a campaign to take the most profitable merchant accounts that were purchased by Paysafe and move them to new payment processors.

44.     Merchant Lynx has also defaulted on its obligation to indemnify Paysafe under the RBO Agreement.

45.     Merchant Lynx's material breaches of the contracts with Plaintiffs have caused Plaintiffs significant damages, well in excess of $7 million.  Merchant Lynx's conduct described in this complaint and the resulting damage and loss have necessitated the retention of attorneys. Pursuant to the terms of the RBO Agreement, the Sub-ISO Agreement and Texas Civil Practice and Remedies Code § 38.001, Plaintiffs are entitled to recover their reasonable attorneys' fees incurred in prosecuting these claims.  Plaintiffs are also entitled to recover pre-judgment and post-judgment interest, expert witness fees, and costs of suit.

46. Plaintiffs have performed all conditions precedent to enforcement of the iPayment Agreements and the RBO Agreement or they have been waived.

**Count 2:**        **Tortious Interference with Contracts**

47. Paysafe and iPayment have valid contracts and long-standing relationships with merchants for payment processing and related services. Merchant Lynx was aware of these contracts and relationships; indeed, Plaintiffs paid Merchant Lynx to help solicit many of those relationships.

48. After the RBO Agreement was executed and Merchant Lynx received a payment of $15 million from Paysafe to purchase residuals from more than 3,100 merchant accounts, Merchant Lynx willfully and intentionally interfered with Plaintiffs' contracts and relationships with these merchants by moving their accounts to one or more new payment processing companies and by the "slamming" activity discussed above, be it through sales agents working directly on Merchant Lynx's behalf or through sales agents that Merchant Lynx was obligated to ensure would not solicit Plaintiffs' customers. Either way, Merchant Lynx and its sales agents knew that Paysafe had binding contracts with customers and that any efforts to take those customers – either for Merchant Lynx's benefit or for the benefit of some other financial institution known to a Merchant Lynx sales agent – would only be possible by ill-gotten means.

49. Merchant Lynx and its agents' tortious interference with Plaintiffs' relationships has proximately caused Plaintiffs significant damages in excess of the jurisdictional limits of this Court.

50. Further, because Merchant Lynx's actions set forth above were fraudulent and malicious, Plaintiffs are entitled to exemplary damages to the fullest extent permitted by law.

**Count 3:        Common Law Misappropriation of Trade Secrets**

51.     During its contractual relationships with Plaintiffs, Merchant Lynx has access to and used Plaintiffs' trade secrets and confidential information.  This includes detailed information regarding Plaintiffs and their business methods, sales, and financial information.  It also includes detailed information regarding Plaintiffs' merchant relationships including the services Plaintiffs provided to those merchants, pricing information, credit card processing equipment and software programs used by Plaintiffs and the merchants, processing volume, pricing and fees, profitability, the terms and conditions of Plaintiffs' contracts with merchants and information related to the termination rights available to merchants, and Plaintiffs and merchants' banking relationships.

52.     Merchant Lynx acquired Plaintiffs' trade secret and confidential information through an express confidential relationship.  Merchant Lynx breached that agreement and the trust Plaintiffs placed in Merchant Lynx by using Plaintiffs' trade secret and confidential information to unfairly compete against Plaintiffs.

53.     Based on the information available to Plaintiffs at this time and the reports Plaintiffs have received from customers, Merchant Lynx has been soliciting the largest customers and using Plaintiffs' highly confidential information regarding merchants' processing volume, processing equipment, profitability, Plaintiffs' pricing and fees with those merchants, and the terms and conditions of Plaintiffs' contracts with customers to unfairly compete and undermine valuable and long-standing customer relationships.  Merchant Lynx is now working with a competing payment processing company and soliciting business – in violation of its contractual obligations – to benefit itself and its new partner by illegally using Plaintiffs' trade secrets and confidential information.

54.     Merchant Lynx's improper use of trade secrets, in violation of clear contractual prohibitions and in concert with its other breaches of contract and solicitation activities, have

caused Plaintiffs and its merchants serious harm, destroyed important and extensive customer relationships, and threatened Plaintiffs' business.  The harm caused by Merchant Lynx's actions is not presently ascertainable.  As discussed below, Plaintiffs seek injunctive relief to prevent present and future harm from Merchant Lynx and monetary relief for the harm that has already occurred or that cannot be remedied by injunctive relief.

**Count 4:**          **Statutory Misappropriation of Trade Secrets**

55.     Merchant Lynx has misappropriated Plaintiffs' trade secret information, as that term is defined in the Texas Uniform Trade Secrets Act, Texas Civil Practice and Remedies Code § 134A.001 *et seq*.  Merchant Lynx is using that information to wrongfully compete against Plaintiffs and take valuable and long-standing customer accounts.

56.     Merchant Lynx acquired Plaintiffs' trade secrets and confidential information through a 16-year relationship with iPayment and Paysafe that was subject to strict confidentiality covenants.  Merchant Lynx had a duty to maintain the secrecy of Plaintiffs' trade secrets and confidential information during the course of that relationship and for a defined period of years after those agreements were terminated.  At the time of Merchant Lynx's use or disclosure of the trade secrets, it knew of its contractual duties to Plaintiffs – and it had recently renewed those covenants to Plaintiffs.  Accordingly, Merchant Lynx has violated the Texas Uniform Trade Secrets Act.

57.     Plaintiffs seek injunctive relief to prevent on-going and future wrongful acts under Texas Civil Practice and Remedies Code § 134A.003, as well as damages for past use of the trade secrets (§ 134A.004) and attorneys' fees (§ 134A.005).

**Count 5:**        **Constructive Trust**

58.        Merchant Lynx has deprived Plaintiffs of its relationships with its merchants who used its range of services.  iPayment and Paysafe relied on Merchant Lynx's covenants in the Sub-ISO Agreement and the RBO Agreement that Merchant Lynx would protect and not use Plaintiffs' and the merchants' financial and business operations information and that Merchant Lynx would not solicit, persuade, or influence merchants to discontinue use of Plaintiffs' services.  However, Merchant Lynx has breached those covenants and unjustly enriched itself by its violations of contractual duties and its tortious conduct.

59.        It would be both unjust, unconscionable, and in continuing breach of Merchant Lynx's common law and contractual obligations, for it to benefit from its conduct and retain any financial or other benefits it received as a result of its wrongful conduct.

60.        The Court should impose a constructive trust on any of Merchant Lynx's property and accounts that has received any benefit from its wrongful conduct or has in any way been used to facilitate its wrongful conduct.  This is, absent payment by Merchant Lynx to Plaintiffs of all sums due, the only remedy that will prevent Merchant Lynx's unjust enrichment.  Accordingly, Plaintiffs request the imposition of a constructive trust on all such property or accounts in the event Merchant Lynx fails to make full restitution for its wrongful conduct.

**Count 6:**        **Permanent Injunction**

61.        A United States District Court has jurisdiction to enter permanent injunctions.  Fed. R. Civ. P. 65.  Upon success on the merits in this case, and in accordance with Rule 65 and the terms of the Sub-ISO Agreement and RBO Agreement, Plaintiffs request that the Court enter an order that:

- Requires Merchant Lynx to return any and all of the Plaintiffs' property (including any merchant accounts) in its possession;

- Prohibits Merchant Lynx from using or disclosing any of the Plaintiffs' confidential and trade secret information;

- Merchant Lynx not use, copy, reproduce, divulge, publish, circulate, or disclose any financial information, business operations information, proprietary information, know-how, technology, techniques, business plans, or marketing plans related to iPayment or its Referred Merchants (as that term is defined in the Sub-ISO Agreement);

- Merchant Lynx not use, copy, reproduce, divulge, publish, circulate, or disclose any financial information, business operations information, proprietary information, know-how, technology, techniques, business plans, or marketing plans related to Paysafe or any iPayment Merchant Accounts identified in Schedule 1 of the RBO Agreement;

- Merchant Lynx not solicit, persuade, or influence any Referred Merchants to: (i) cease their relationship with Plaintiffs, (ii) interfere with or disrupt their relationship with Plaintiffs, or (iii) have credit card authorization, processing, and/or related services provided by anyone other than Plaintiffs; and

- Merchant Lynx not solicit, persuade, or influence any iPayment Merchant Accounts identified in Schedule 1 of the RBO Agreement to: (i) cease their relationship with Plaintiffs, (ii) interfere with or disrupt their relationship with Plaintiffs, or (iii) have credit card authorization, processing, and/or related services provided by anyone other than Plaintiffs.

62.     After a trial, the Court may impose a permanent injunction.  To obtain permanent injunctive relief, a plaintiff must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *ITT Educ. Servs., Inc. v. Acre*, 533 F.3d 342, 347 (5th Cir. 2008).

63.     <u>Immediate and Irreparable Harm</u>.  If Merchant Lynx is allowed to take detailed financial and business operations information of Plaintiffs and use that information to compete against Paysafe and iPayment and take advantage of its illegal conduct following the execution of the RBO Agreement, it will continue to cause irreparable injury to the Plaintiffs and the relationships they have created and supported over many years, for which there is no adequate

remedy at law.  Plaintiffs are threatened with the loss of significant business, the value of which cannot be calculated at this time.

64.     In addition to the clear factual record of the harm Merchant Lynx caused to Plaintiffs, there is a significant legal basis for showing an irreparable injury.  The parties' contracts expressly provide for equitable relief, including injunctive relief or specific performance, in the event Merchant Lynx breached the confidentiality and the non-solicitation provisions of the Sub-ISO Agreement and the RBO Agreement.  *See* Exhibit B at § 14 ("Equitable Relief") and Exhibit D at § 3.3 ("Equitable Relief").

65.     Further, under applicable law, Merchant Lynx's conduct has posed irreparable harm to Plaintiffs.  First, the Texas Uniform Trade Secrets Act provides that "actual or threatened misappropriation may be enjoined," provided however that the order must not "prohibit a person from using general knowledge, skill, and experience."  Tex. Civ. Prac. & Rem. Code § 134A.003. Unlike certain other forms of injunctive relief, the Texas Uniform Trade Secrets Act allows a Court to require that the defendant take affirmative acts to protect a trade secret and to pay a reasonable royalty to the plaintiff.  *Id.* § 134A.003(b) & (c).  Second, as the United States Court of Appeals for the Fifth Circuit has held, breach of a confidentiality agreement causes irreparable harm.  *Toon v. Wackenhut Corr. Corp.*, 250 F.3d 950, 954 (5th Cir. 2001) ("confidentiality was at the heart" of the parties' agreement, and "there is unfortunately no cure for the breach of the confidentiality agreement, which has been exposed to the public. We have no doubt that counsel were aware of the irreparable and irreversible consequences…").  Third, while a mere loss of finite income is compensable in money damages, a substantial loss of accounts or business may amount to an irreparable injury and injunctive relief may be appropriate if the amount of loss or lost profits is

difficult or impossible to calculate.  *See Florida Businessmen for Free Enterprise v. City of Hollywood*, 648 F.2d 956, 958 n. 2 (5th Cir. 1981) (granting injunction on appeal).

66.   <u>Benefits of Injunction Outweighs Alleged Damage to Merchant Lynx.</u>  The greater injury will result from denying the injunction than from granting it.  Additionally, the injunctive relief requested herein largely restates the obligations under the agreements between iPayment and Paysafe, on the one hand, and Merchant Lynx, on the other hand.  Specifically, the requested injunction will restore, in part, the status quo that existed on the date of the RBO Agreement.  It will restore Plaintiffs' confidential information.  The requested injunction will prohibit Merchant Lynx from engaging in further fraudulent and wrongful actions to solicit merchant accounts in violation of its agreements with the Plaintiffs.

67.   <u>Public Interest</u>.  The public interest will not be disserved by issuing an injunction. The public is served by an injunction because the obligations breached by Merchant Lynx are destructive to sound and productive business practices that fuel a healthy economy.  Moreover, the interest of the merchants are served by protecting them against Merchant Lynx's slamming activities and their other wrongful conduct and misrepresentations.

## VI.   PRAYER

Plaintiffs request that Merchant Lynx be cited to appear and answer, and that upon final trial, Plaintiffs have: (a) judgment against Merchant Lynx for all actual damages for breach of contract and tortious interference with contract; (b) all exemplary damages for tortious interference with contract; (c) pre-judgment and post-judgment interest as provided by law; (d) costs of suit; (e) reasonable and necessary attorneys' fees and expert witness fees; and (f) other and further relief to which Plaintiffs may be justly entitled.

In addition, upon its success on the merits, Plaintiffs request that the Court grant Plaintiffs' application for a permanent injunction as set forth above because: (1) Merchant Lynx's actions

pose a substantial threat of immediate and irreparable harm for which Plaintiffs have no adequate remedy at law should the injunctive relief not be awarded at the conclusion of the case; (2) greater injury to Plaintiffs will result from denying the permanent injunction than from it being granted against Merchant Lynx; and (4) injunctive relief will not disserve the public interest.

Respectfully submitted,

By: */s/ Richard A. Howell*
 Richard A. Howell
 Texas Bar No. 24056674
 SD Bar No. 959050
 rahowell@jw.com
 Joel R. Glover
 Texas Bar No. 24087593
 SD Bar No. 2221289
 jglover@jw.com
 **JACKSON WALKER L.L.P.**
 1401 McKinney, Suite 1900
 Houston, Texas 77010
 (713) 752-4531 – Phone
 (713) 752-4221 – Fax

  **ATTORNEY FOR PLAINTIFFS**